IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

CELLULAR SOUTH REAL ESTATE,  )
INC.,  )
  )
      Plaintiff,  )
  )
vs.  )     CIVIL ACTION NO. 15-00387-CG-B
  )
CITY OF MOBILE, ALABAMA,  )
  )
      Defendant.  )

## ORDER

This matter is before the Court on the Motion for Summary Judgment (Doc. 22), filed by Cellular South Real Estate, Inc. ("Plaintiff"), the Motion for Summary Judgment (Doc. 23), Brief in Support (Doc. 24), and Notice of Filing Exhibits (Doc. 25), filed by the City of Mobile, Alabama ("Defendant"), and the parties' respective responses and replies (Docs. 29-32). For the reasons set forth herein, Plaintiff's motion for summary judgment is due to be **GRANTED in part and DENIED in part**, and Defendant's motion for summary judgment is due to be **GRANTED in part and DENIED in part**.

## I. BACKGROUND

The facts in this case are not disputed. Only the characterization of those facts is at issue.

On January 8, 2014, Defendant granted Plaintiff "authorization to submit

various applications necessary for a cell phone tower site in the City owned Ladd-Peebles Stadium parking lot." (Doc. 18-17, p. 23). Because construction of the tower at that location required zoning variances, Plaintiff submitted an application to the Board of Zoning Adjustment ("Board") on August 21, 2014. Id. at 37. The application sought five variances:

- A variance to the setback requirement of the tower height
- A variance to exceed the height limit of 45 feet by 105 feet
- A variance to reduce the separation requirement to residentially zoned property from the required 225 feet
- A variance to requiring paved parking. The site is located at Ladd-Pebbles [sic] Stadium
- A landscaping variance

Id. The variance requests were in response to city zoning ordinances requiring (1) a setback distance of the height of the tower from the property line; (2) a maximum tower height of forty-five feet; (3) a buffer distance between the proposed tower and residential areas of approximately 225 feet; (4) paved access to the tower site; and (5) the planting of trees every thirty feet around the perimeter of the site. Mobile, Ala. Code § 64-4(J)(5)(a)(2); id. § 64-3(E)(3)(d); id. § 64-4(J)(7)(a); id. § 64-4(J)(14); id. § 64-4(J)(11).

The Staff of the Board of Zoning Adjustment ("Staff") issued a report on December 1, 2014, regarding Plaintiff's variance requests. (Doc. 18-9, p. 18). The Staff found that the height variance was needed for the new tower because collocation opportunities on towers of similar height nearby were nonexistent. Id. at 20. The setback and residential buffer variances were needed so that the tower could be located in an area of the stadium property that would not affect available parking. Id. The variance for paved access was reasonable because "much of the

stadium parking within this area is a gravel-grass mixture, and the access drive would be of short length and low-usage." Id. at 21. Finally, the Staff decided that the tree planting variance was needed because "stadium staff previously requested no tree plantings be required due to conserving parking area." Id. Despite finding that all of the variance requests were reasonable, the Staff withheld recommendation, pending review by the City Planning Commission ("Commission"). Id.

After the Commission expressed concerns about the tower's proximity to residential areas, Plaintiff shifted the planned tower site "approximately 345' West of the previously proposed location" and submitted an amended application on April 2, 2015. (Doc. 18-8, p. 48; Doc. 18-17, p. 21). The change eliminated the need for a residential buffer variance. The Commission approved the application on June 23, 2015, conditioned upon Plaintiff acquiring the Board's approval for the variance requests. (Doc. 18-6, p. 26).

On July 6, 2015, in light of the Commission's approval of the amended application, the Staff issued another report on Plaintiff's proposed tower. (Doc. 18-8, p. 44). The Staff reaffirmed its 2014 report and added an addendum addressing the change of the tower location. Id. at 48. The Staff recommended that the Board approve the application, stating the following:

> RECOMMENDATION: Staff recommends to the Board the following findings of facts for approval:
>
> 1) Based on the fact that the site is within a public stadium parking lot, the variance will not be contrary to the public interest;
> 2) These special conditions (the site is of limited space and adjacent to an existing compound which was given special considerations for

> development) exist such that a literal enforcement of the provisions
> of the chapter will result in unnecessary hardship; and
>
> 3) That the spirit of the chapter shall be observed and substantial
>    justice done to the applicant and the surrounding neighborhood by
>    granting the variance in that no other tower sites were available for
>    collocation.
>
> Therefore, this application is recommended for approval . . . .

Id. at 49.

The Board conducted a hearing on the application on July 6, 2015. (Doc. 18-

18, p. 18). By the time of the hearing, Defendant had in its possession

approximately fifty letters (Doc. 18-3, pp. 24-72; Doc. 18-4, pp. 15, 22, 44) and a

petition with almost 200 signatures (Doc. 18-3, pp. 73-90; Doc. 18-4, pp. 2-14; Doc.

18-14, p. 28), all opposed to the tower. At the hearing, two residents spoke in

opposition to the tower, while only Plaintiff's representative spoke in favor. (Doc.

18-18, pp. 19, 21). After discussion amongst the Board members and the Board's

attorney, the Board unanimously voted to reject Plaintiff's application, save for one

member who recused. Id. at 23. The Board's minutes reflect the reasons for denial:

> The Board determined the following findings of fact for Denial:
>
> 1) Based on the fact that the site is within close proximity to a large
>    number of residences, approval of the variance would be contrary to
>    the public interest;
> 2) These special conditions exist such that there are more suitable
>    sites for a telecommunications tower to be located further away
>    from a residential area so that literal enforcement of the provisions
>    of the chapter will not result in unnecessary hardship; and
> 3) That the spirit of the chapter shall not be observed and substantial
>    justice shall not be done to the surrounding neighborhood by
>    granting the variance in that other tower sites are available for
>    collocation.

Id. On July 8, 2015, the Board issued a "Letter of Decision" to Plaintiff and restated

4

the grounds for denial above. (Doc. 18-10, p. 12). On August 3, 2015, Plaintiff filed

the current action, alleging violations of the Telecommunications Act of 1996. (Doc.

1). In Count 1, Plaintiff argues that Defendant's denial was not "supported by

substantial evidence contained in a written record" as required by 47 U.S.C. §

332(c)(7)(B)(iii) (2012). In Count 2, Plaintiff maintains that Defendant "prohibit[ed]

or ha[d] the effect of prohibiting the provision of personal wireless services" in

violation of 47 U.S.C. § 332(c)(7)(B)(i)(II) (2012).


## II. ANALYSIS

### A. The Summary Judgment Standard

Federal Rule of Civil Procedure 56(a) instructs that "[t]he court shall grant

summary judgment if the movant shows that there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law." The trial

court's mission is to "determine whether there is a genuine issue for trial" and not

to "weigh the evidence." See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249

(1986).

The burden is on the moving party to show that there is no genuine dispute

as to any material fact. Id. at 256. In conducting its summary judgment analysis,

the Court must construe all evidence "in the light most favorable to the party

opposing the motion." United States v. Diebold, Inc., 369 U.S. 654, 655 (1962).

After the movant meets its burden, the burden shifts to the nonmoving party

"to make a showing sufficient to establish the existence of an element essential to

that party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). If the nonmoving party fails to do so, the "complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. at 323. Further, Rule 56 "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Id. at 324 (internal quotation marks omitted). There is no genuine issue for trial "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

### B. The Telecommunications Act of 1996

The Telecommunications Act ("TCA") "balance[s the] national interest in telecommunications growth with the local interest in zoning control." T-Mobile S., LLC v. City of Milton, Ga., 728 F.3d 1274, 1276 (11th Cir. 2013). Although the TCA largely leaves to the municipality the decision of whether to allow a wireless carrier to build a tower within its jurisdiction, the Act does place certain limitations and requirements on the local government. In relevant part, the Act requires any denial of "a request to place, construct, or modify personal wireless service facilities . . . be in writing and supported by substantial evidence contained in a written record." 47 U.S.C. § 332(c)(7)(B)(iii) (2012). The TCA also restrains a municipality from "prohibit[ing] or hav[ing] the effect of prohibiting the provision of personal wireless services." Id. § 332(c)(7)(B)(i)(II).

## 1. Substantial Evidence

The TCA's substantial evidence standard "is the traditional substantial evidence standard used by courts to review agency decisions." Am. Tower LP v. City of Huntsville, 295 F.3d 1203, 1207 (11th Cir. 2002). The standard is defined as "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Preferred Sites, LLC v. Troup Cnty., 296 F.3d 1210, 1218 (11th Cir. 2002) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). "Substantial" means "'more than a mere scintilla but less than a preponderance.'" Am. Tower, 295 F.3d at 1207 (quoting 360° Commc'ns Co. v. Bd. of Supervisors, 211 F.3d 79, 83 (4th Cir. 2000)). The substantial evidence standard "requires courts to take a harder look than when reviewing under the arbitrary and capricious standard." Preferred Sites, 296 F.3d at 1218. A reviewing court must peruse "the record in its entirety, including evidence unfavorable to the state or local government's decision." Id. A court "cannot displace the [municipality's] fair estimate of conflicting evidence and cannot freely re-weigh the evidence." Am. Tower, 295 F.3d at 1209 n.8. While a court is forbidden from "substitut[ing] its own judgment for that of the local board, . . . it must overturn the board's decision if the decision is not supported by substantial evidence." Preferred Sites, 296 F.3d at 1218-19.

Defendant's municipal code speaks to the power of the Board to determine whether to grant or deny a variance:

> Variances. To authorize, upon appeal in specific cases, such variance from the terms of this chapter as will not be contrary to the public interest where, owing to exceptional circumstances, literal enforcement of the provisions of this chapter will result in unnecessary hardship.

Variances shall be subject to such conditions and terms as may be fixed by the board. No variance shall be authorized:

(a) Where the area of the property, the variance for which is sought, is sufficient to authorize the creation of a new district under the amendment procedures of this chapter for the applicable use;

(b) In order to relieve an owner of a lot of restrictive covenants applicable to said lot which are recorded in the probate court;

(c) Where economic loss is the sole basis for the application for variance;

(d) Unless the board is presented with sufficient evidence for the board to find that:

1. The variance will not be contrary to the public interest;

2. Special conditions exist that a literal enforcement of the provisions of the chapter will result in unnecessary hardship; and

3. That the spirit of the chapter shall be observed and substantial justice done to the applicant and the surrounding neighborhood by granting the variance.

Mobile, Ala. Code § 64-8(B)(6)(f)(3). It is apparent from the language used in the minutes and denial letter that the Board declined to permit the requested variances due to (d). The Board's three grounds for denying Plaintiff's application will each be discussed in turn.

### a. Proximity

The Board found that "approval of the variance would be contrary to the public interest" because "the site is within close proximity to a large number of residences." (Doc. 18-18, p. 23). Plaintiff argues that this ground for denial, along with the other grounds, "was [not] supported by even a scintilla of relevant

8

evidence, much less substantial evidence, contained in the written record."[1] (Doc. 22, p. 11). For the proximity ground in particular, Plaintiff likens the letters and petition to a "not in my back yard" sort of objection, merely "generalized opposition." Id. Defendant counters by focusing on Alabama law treating the zoning variance as the exception, not the rule. (Doc. 24, p. 12). Defendant argues that the letters and petition expressing concerns "rang[ing] from negative impacts on property values, to visual impacts on residential and historical areas nearby, to concerns over impacts on the stadium campus used by residents for recreation" were sufficient to support the Board's denial.[2] Id. at 17.

The tower site is located in a district zoned as "B-3," which is defined in Defendant's municipal code as:

> B-3 districts: Community business districts. These districts are composed of land and structures used to furnish, in addition to the retail goods and services found in neighborhood business districts, such less frequently needed goods as clothing and automobiles—the wider range of retail goods and services to satisfy all the household and personal needs of the residents of a group or community of neighborhoods. Light or heavy distribution uses may be allowed as defined in the chart of permitted uses. Usually located on a thoroughfare or near the intersection of two (2) thoroughfares, these districts are large and are within convenient driving distance of the group of neighborhoods they will serve. The district regulations are

---

[1] In addition to Plaintiff's argument that the Board's decision was not supported by substantial evidence, Plaintiff's complaint alleged that "the City has not issued or provided any written record or statement of its decision to deny [Plaintiff's] Application." (Doc. 1, p. 6). Plaintiff has since conceded that claim. (Doc. 29, p. 10).

[2] Defendant also discusses the proximity of the tower site to nearby schools. (Doc. 24, p. 17; Doc. 30, p. 16). However, the Board did not ground its decision on the juxtaposition of the tower site to school property. Rather, the Board only concerned itself with nearby "residences." Thus, the Court will not entertain Defendant's school argument.

designed to permit the development of the districts for their purpose in a spacious arrangement.

To protect the abutting and surrounding residential areas certain restrictions are placed on uses. It is intended that additional community business districts will be created in accordance with the amendment procedure set forth herein, as they are needed to serve groups of new neighborhoods. To insure that such districts are actually developed to supply the business needs of the groups of neighborhoods, the amendment creating the district may set a time limit for its development.

Mobile, Ala. Code § 64-3(E)(3). Towers are allowed in B-3 districts, but only if "planning approval has been granted by the Mobile city planning commission."[3] Id. § 64-4(J)(4)(a). The land immediately south of the stadium site and closest to the proposed tower is an area zoned for industrial use. See City Map, http://maps.cityofmobile.org/citymap/index.html (last visited June 26, 2016); Mobile, Ala. Code § 64-3(A)(2) (adopting the map as part of the code's chapter on zoning). The remainder of the area surrounding the stadium property is zoned as residential. See City Map, supra.

If the Court were to take the first ground of denial literally, that the Board was unhappy at the particular distance between the proposed tower site and the residences, the Court would find that the Board's denial lacked substantial evidence. Plaintiff's tower meets the residential buffer zone requirement of 150% of the height of the tower. See Mobile, Ala. Code § 64-4(J)(7)(a). The tower's height is 152 feet, so it must be located at least 228 feet from the nearest residence to meet the zoning requirements. (Doc. 18-8, p. 48). The closest residentially-zoned area is

---

[3] Towers are allowed in industrial zones "by right" and prohibited in residential areas. Mobile, Ala. Code § 64-4(J)(4)(a).

located approximately 350 feet from the proposed tower site. Id. Thus, Plaintiff
meets Defendant's residential buffer zone requirement, and Defendant is barred
from denying Plaintiff's variance requests on that ground. See, e.g., Vertex Dev.,
LLC v. Marion Cnty., No. 5:07-cv-380-Oc-10GRJ, 2008 WL 2994259, at *16 (M.D.
Fla. Aug. 1, 2008) ("Moreover, to the extent that the Board is relying on the
comments . . . that the tower would be too close to their property lines and to
County Road 475, the Court finds that these comments also cannot constitute
substantial evidence because proximity concerns are specifically addressed by the
Code's established setback requirements, and Vertex not only met but exceeded
them.").

　　　However, even if the Court were to liberally construe the Board's concerns
about proximity, the Court would still find a deficit of substantial evidence. While
the Board did not expressly state why the close proximity was a problem, it is
apparent that the Board had, or at least considered, concerns over safety and
aesthetics. The safety concerns are easy to dispatch. At the Board meeting, two
members of the community opposed to the tower averred, "The Planning
Commission [who granted conditional approval of the tower] ignored the dangers
from strong winds from severe storms and the potential destruction of property and
lives as a result of the tower being constructed in the open area of the stadium
grounds . . . ." (Doc. 18-18, p. 19). The majority of letters submitted to Defendant
were form letters, and they spoke of perceived dangers such as "hazardous
materials" allegedly associated with tower sites (Doc. 18-3, pp. 28-32, 43-44), the

potential for fire, "falling debris," and the tower's collapse (Doc. 18-3, pp. 35-36, 42, 45-47, 49, 52, 57-68), and the possibility for the tower to "explode" or for "batteries in [the tower] . . . [to] leak sulfuric acid." (Doc. 18-3, pp. 37-41, 51, 53-56, 69, 71; Doc. 18-4, p. 15). Those who signed the petition were concerned with safety issues during storms and maintenance.[4] (Doc. 18-3, pp. 73-90; Doc. 18-4, pp. 2-14; Doc. 18-14, p. 28).

None of these safety concerns were supported by a single shred of evidence. Within its application, Plaintiff submitted a certification by a professional engineer that the tower did not "pose a risk of explosion, fire or other danger due to its proximity to volatile, flammable, explosive, or hazardous materials." (Doc. 18-5, p. 12). Another engineer certified that the tower was designed to "collaps[e] upon itself" should an unlikely event cause the structure to fall. (Doc. 18-17, p. 75). The unsubstantiated complaints offered by the letters and petition do not constitute substantial evidence, particularly in light of the expert documentation. The "proximity" ground is not supported by these safety concerns.

The Court of Appeals for the Eleventh Circuit has opined on the use of aesthetics as substantial evidence three times. In <u>American Tower LP v. City of</u>

---

[4] The letters and petition also contained concerns about "electromagnetic radiation" and the like emanating from the tower. However, the TCA expressly forbids municipalities from "regulat[ing] the placement, construction, and modification of personal wireless service facilities on the basis of the environmental effects of radio frequency emissions to the extent that such facilities comply with the [Federal Communications] Commission's regulations concerning such emissions." 47 U.S.C. § 332(c)(7)(B)(iv) (2012). Plaintiff submitted a statement in its application verifying that the tower would comply with FCC regulations. (Doc. 18-17, pp. 49-51). The Court will disregard these complaints for the substantial evidence analysis.

Huntsville, 295 F.3d 1203, 1206 (11th Cir. 2002), the plaintiff attempted to build a tower in a residentially-zoned area. The plaintiff needed a height variance, as well as the city's permission to build the tower in the residential neighborhood. Id. At the public hearing, "[s]everal (10+) residents in the area of the proposed tower property testified against granting the application, and many more (60+) residents signed a petition asking the [city] to deny the application," leading the city to turn down the plaintiff's request. Id.

> The court began its discussion by declaring:
>
> Land use decisions are basically the business of state and local governments. The Telecommunications Act of 1996 ("TCA") does not say otherwise. The legitimate power of federal courts to interfere in the kind of zoning decision involved in this case is limited.

Id. at 1206-07 (citations omitted). The court found that the city "was authorized to consider . . . the proposed tower's negative aesthetic impact (as well as its effect on property values) and the proposed tower's effect on the health, safety, and welfare of the public" pursuant to the city's zoning ordinances. Id. at 1208. The court held that "testimony from several residents on the negative aesthetic and value impact of the proposed tower" was enough to show that the city's denial was supported by substantial evidence. Id. The court highlighted testimony from a realtor who testified that the tower would devalue property in the area and "that she had already lost potential buyers for her own property in the area because of the proposed tower." Id. This testimony, coupled with "testimony on safety questions tied to the proposed tower's unusual proximity to two schools and several soccer fields used by children," provided the city with substantial evidence for its decision.

Id. at 1208-09.

Preferred Sites, LLC v. Troup County, 296 F.3d 1210 (11th Cir. 2002), was decided approximately two weeks later. The plaintiff requested conditional use approval to build a 250-foot tower on "property with an appropriate zoning classification approved for the construction of a tower." Id. at 1219. At the hearing, "several members of the public verbally opposed construction of the tower," apparently because of its "visual obtrusiveness." Id. at 1213. In addition, the county was in possession of petitions signed by over fifty people that "objected generally to the construction of the tower." Id. The county denied the application for a conditional use permit. Id. at 1214.

The court held that "the citizens' generalized concerns about aesthetics are insufficient to constitute substantial evidence upon which the Board could rely." Id. at 1219. A negative aesthetic impact can only provide "a valid basis for denial of a permit if substantial evidence of the visual impact of the tower is before the board." Id. Denials are not justified when supported only by "[m]ere generalized concerns regarding aesthetics." Id.

In Michael Linet, Inc. v. Village of Wellington, Florida, 408 F.3d 757, 760 (11th Cir. 2005), the plaintiff sought to build a 120-foot tower disguised as a flagpole on a golf course. The plaintiff was required to get approval by the village due to the height of the structure. Id. At the hearing, "[r]esidents testified that they would not have purchased their homes if the pole was present and a local realtor testified the pole would adversely impact home resale values." Id. The village declined to issue

the plaintiff a construction permit. Id.

The Eleventh Circuit began by stating:

> A blanket aesthetic objection does not constitute substantial evidence under § 332. Such a standard would eviscerate the substantial evidence requirement and unnecessarily retard mobile phone service development. Aesthetic objections coupled with evidence of an adverse impact on property values or safety concerns can constitute substantial evidence. Also relevant is whether the company can reasonably place a cell site in an alternative location and eliminate the residents' concerns.

Id. at 761-62 (citations omitted). The court determined that the testimony by the residents and realtor regarding "adverse property value impact concerns," combined with the plaintiff's failure to "show that an alternative location was unavailable or unfeasible" and the site's location "unnecessarily close to a local middle school," was enough to constitute substantial evidence. Id. at 762.

A survey of Eleventh Circuit district court cases regarding aesthetics since the Michael Linet decision reveals very little consistency. See, e.g., PI Telecom Infrastructure, LLC v. City of Jacksonville, Fla., 104 F. Supp. 3d 1321, 1345 (M.D. Fla. 2015) (holding that simulated photographs "of a proposed cell tower from a public park, a space which, by ordinance, the City is trying to protect and keep pristine, rises above 'mere generalized concerns regarding aesthetics'"); T-Mobile S. LLC v. City of Milton, Ga., 27 F. Supp. 3d 1289, 1301-02 (N.D. Ga. 2014) (finding that balloon test evidence showed the negative impact on residences as well as "specific farms, equestrian facilities, and scenic highway corridors"); T-Mobile S. LLC v. Cobb Cnty., Ga., No. 1:10-cv-0111-WSD, 2011 WL 336641, at *7-8 (N.D. Ga. Jan. 31, 2011) (ruling that testimony by a realtor of the detrimental impact on

property values and the site's location in an area zoned residential were enough to support the denial); Vertex Dev., LLC v. Manatee Cnty., 761 F. Supp. 2d 1348, 1370 (M.D. Fla. 2011) (deciding that "[t]he photo simulation, residents' testimony, property value evidence, and testimony concerning alternative cell phone tower sites constitute substantial evidence within the record upon which the BOCC was entitled to base the BOCC's decision"); Wireless Towers, LLC v. City of Jacksonville, Fla., 712 F. Supp. 2d 1294, 1304-05 (M.D. Fla. 2010) (concluding that photographic simulation evidence of the impact the tower would have on views from the surrounding areas, which included a state park, a preserve, and a creek used as a kayak trail, constituted substantial evidence); Verizon Wireless Pers. Commc'ns LP v. City of Jacksonville, Fla., 670 F. Supp. 2d 1330, 1343 (M.D. Fla. 2009) (determining that balloon test evidence supported the wireless company and that letters complaining of the view from a park and preserve were unsupported by evidence); T-Mobile S., LLC v. Coweta Cnty., Ga., No. 1:08-CV-0449-JOF, 2009 WL 596012, at *9 (N.D. Ga. Mar. 5, 2009) (holding that a resident's complaint that the proposed tower would ruin the view and lower property values was generalized and did not constitute substantial evidence); Vertex Dev., LLC v. Marion Cnty., No. 5:07-cv-380-Oc-10GRJ, 2008 WL 2994259, at *16-17 (M.D. Fla. Aug. 1, 2008) (judging that aesthetics was only a generalized concern when the only evidence in support was testimony by one homeowner "who personally witnessed the photo simulations and confirmed that the tower would be barely visible" and general layman testimony about decreasing property values); T-Mobile S. LLC v. City of

16

Jacksonville, Fla., 564 F. Supp. 2d 1337, 1347-48 (M.D. Fla. 2008) (finding substantial evidence composed of a planning committee's recommendation of denial, simulated photographs of the proposed tower, and "uncontroverted testimony" by residents that trees meant to provide a buffer around the tower were being removed); Se. Towers, LLC v. Pickens Cnty., Ga., 625 F. Supp. 2d 1293, 1304 (N.D. Ga. 2008) (reasoning that balloon test evidence showing views of the tower from several structures within a historical district was enough to meet the substantial evidence standard); TBCom Props., LLC v. City of New Smyrna Beach, No. 6:06-cv-1677-Orl-28KRS, 2007 WL 1970863, at *4 (M.D. Fla. July 3, 2007) (ruling that the city's denial based on aesthetics was invalid when the 195-foot proposed tower was located near other tall structures, including "gas station signs of 110 and 91 feet"). It is apparent that there is no bright line rule to determine whether a given amount of aesthetic evidence is enough to support a finding of substantial evidence.

In this case, the residents' concerns were "generalized" as in Preferred Sites. The residents' protest of the tower impact on neighborhood views was not supported by any evidence. The only evidence relating to the tower's changing of the city's landscape is found in Plaintiff's application. (Doc. 18-2, pp. 4-5). The first simulation shows how the tower would appear next to the stadium. The second simulation shows how the tower would look when viewed from a residence at an undisclosed location. At this particular residence, the majority of the tower is hidden from view by trees. Regardless, there is no indication that the Board considered these photographs when making its decision or that any of the residents referenced these

photographs in making their complaints. The lack of evidence relating to the views of the tower is amplified when considering the current "character" of the proposed location. While the stadium site is bordered on three sides by residentially-zoned areas, the south side of the stadium site is an industrially-zoned area composed of abandoned buildings, a railroad track, and a detention pond. (Doc. 18-1, pp. 65-66; Doc. 18-2, pp. 24-25, 27-28; Doc. 18-3, p. 2). The tower is located near a stadium with several light poles approximately "80-100 feet" tall.[5] (Doc. 18-2, p. 4; Doc. 18-18, p. 22; Doc. 21-1, p. 5).

The residents also complained of declining property values. Defendant cites to a plethora of Alabama case law holding that "a property owner [is competent] to testify on the value of his or her land." (Doc. 30, pp. 11-12). While it appears that these cases all address the owner's valuation of property after an event has occurred rather than a prospective valuation, the Eleventh Circuit used an Alabama statute to hold that residents can testify about a prospective tower's "impact on property values." See Am. Tower, 295 F.3d at 1208 n.7; Ala. Code § 12-21-114 (LexisNexis 2012). The problem here is that there were no individualized concerns about declining property values. The residents' complaints were composed of general and

---

[5] The Board's attorney stated at the hearing, "The light poles maybe eighty to a hundred feet are right behind [the tower]. And if those are already there, and this was discussed amongst the planning commission members, what additional aesthetic negative impact does this have on the community with those 80 to 100 foot light poles there. I guess there is probably 10 of those within 100 yards of this proposed location." (Doc. 21-1, p. 5).

unfounded speculation that towers decline property values.[6] In fact, the Eleventh Circuit in addressing a tangential issue recognized that "residential districts can exist in which a tower would not impact on property values significantly" and "significant negative impact on property values is not inherent with towers in residential districts." Am. Tower, 295 F.3d at 1208 n.7. Such vague and speculative protests as those here cannot constitute substantial evidence. Additionally, there was no testimony by any professional, such as a realtor, as in American Tower or Michael Linet. Like the complaints of the tower's impact on the residents' views, the concerns about property values are generalized and unsubstantiated.

Finally, Defendant argues that Plaintiff failed to consider camouflaging the tower to minimize its aesthetic impact. (Doc. 24, p. 21). Defendant's municipal code addresses the camouflage of towers:

---

[6] Two pastors were concerned with "[t]he value of property in the . . . community." (Doc. 18-3, pp. 26-27). One form letter suggested that the tower could deter "future home buyers . . . should resale of our homes become desired or necessary" and argued that "[r]esearch on this subject documents that cell phone towers . . . can decrease property values as much as 20%." Id. at 28-32, 43-44. Another form letter stressed that "studies have demonstrated, and local realtors can attest, that these cell towers drive down housing prices by as much as 20 percent." Id. at 35-36, 42, 45-47, 49, 52, 57-68. Yet another form letter asserted that "home values will decline," an argument that had allegedly "been validated in many communities across the country that also did not want towers in their neighborhoods." (Doc. 18-3, pp. 37-41, 51, 53-56, 69, 71; Doc. 18-4, p. 15). One couple questioned whether "there [is] documented validation that the impact of this cell tower will not decrease home values in our community." (Doc. 18-4, p. 22). Another couple "under[stood] that the value of our homes will substantially decrease with this unwanted addition to the community." Id. at 44. The petition listed "[t]he loss of property and home resale values" as one of the reasons for opposing the tower. (Doc. 18-3, pp. 73-90; Doc. 18-4, pp. 2-14; Doc. 18-14, p. 28). Finally, those opposed at the hearing spoke of "the certain decrease in property values that this tower will have on their homes." (Doc. 18-18, p. 19).

> Camouflage. All towers and telecommunications facilities shall be of camouflage design standards. Examples of camouflage facilities include, but are not limited to, architecturally screened roof mounted antennas, antennas integrated into architectural elements, and telecommunications towers designed to blend into the surrounding environment or to look other than a tower such as light poles, power poles and trees. At a minimum, all towers not requiring FAA painting or marking shall have an exterior finish which is galvanized or painted a dull blue, gray, or black.

Mobile, Ala. Code § 64-4(J)(16). There is no indication in the record that Plaintiff failed to satisfy this requirement. Plaintiff did not request a camouflage variance. Rather, it appears that Defendant inquired whether Plaintiff could exceed the minimal camouflage requirement. At the hearing, the Board questioned whether the tower could be camouflaged like a flagpole and whether residents would be receptive of that change, although the members appear to have decided that it would not be prudent "to offer a compromise without [the residents'] input." (Doc. 21-1, pp. 3-4; Doc. 18-18, p. 22). Camouflage does not seem to have factored into the Board's decision to deny. Further, Plaintiff argues that a flagpole design would have prevented collocation on the tower, which is prohibited by Defendant's municipal code. (Doc. 29, p. 17). The code requires all new towers to be "capable of supporting another person's [comparable] operating telecommunications facilities." Mobile, Ala. Code § 64-4(J)(4)(e). The minutes of the hearing records Plaintiff's representative as stating "that the downside of a flagpole design is the number of units that can be collocated on the structure, and their goal is to have towers on which multiple companies can place their equipment rather than having to build more towers." (Doc. 18-18, p. 22). There is no indication that Plaintiff's tower failed to meet Defendant's camouflage ordinances. An aesthetics argument against the tower is

not supported by substantial evidence.

### b. Additional Sites and Collocation

The remaining two grounds for denial were based on the availability of other sites to construct the tower and other towers for collocation of Plaintiff's cellular antennas. These objections are not supported by any evidence whatsoever. In fact, the evidence in the record regarding additional sites and collocation completely supports Plaintiff. At the hearing, Plaintiff's representative provided a coverage map to the Board and explained that the proposed site was the "only spot" that would allow Plaintiff to fill "gaps in the cell coverage." (Doc. 21-1, p. 2). The representative testified that this conclusion was supported by engineering data. Id. Regarding collocation, the Staff's report states that "the applicant has submitted written, technical evidence from an engineer that the proposed [tower] cannot be installed or collocated on another tower." (Doc. 18-8, p. 46). The report goes on to state:

> [T]here are two other cellular communications towers within a one-half mile radius of the subject site. One is owned by Alabama Power Company and within its service compound approximately 900' to the Southeast, but it is only 105' high which is insufficient to provide adequate service. A 140' high tower located approximately 775' to the Southwest is on Mobile County Public School property, but it is restricted to the sole use of the Mobile County Public School System by variance approval conditions.

Id. This evidence directly contradicts the Board's grounds for denial. The evidence supporting the denial is composed of generalized concerns from residents[7] and

---

[7] A letter from a school commissioner stated, "Structures such as cell phone towers are better suited in industrial locations away from residential communities."

unsubstantiated speculation from Board members that another location would be more suitable. (Doc. 21-1, pp. 5-6). It is apparent that neither of these grounds were supported by any evidence at all, much less substantial evidence.

In sum, the Court finds that the Board's denial was not supported by substantial evidence. It is important to note that this ruling does not determine whether there was enough evidence before the Board to properly deny Plaintiff's application. Rather, the Court only holds that the Board's three grounds for denial were unsupported by substantial evidence. The Court can neither create grounds for denial based on the record, nor can the Court allow Defendant to offer additional grounds for denial at the summary judgment stage. On this issue, Plaintiff is entitled to summary judgment, and Defendant's motion for summary judgment must be denied.

## 2. Effective Prohibition

Plaintiff's second and final claim suggests that Defendant's denial "prohibit[ed] or ha[d] the effect of prohibiting the provision of personal wireless services." 47 U.S.C. § 332(c)(7)(B)(i)(II) (2012). Specifically, Plaintiff claims that the denial "amounts to an effective prohibition of wireless services." (Doc. 1, p. 7). The

---

(Doc. 18-3, p. 24). One pastor suggested "that a more suitable place be located to place this tower," while another two opined "that it would be a wise decision to place the tower in an industrial area instead of a residential area." Id. at 25-27. One couple urged, "Another location should be selected where there are no residents—a commercial or industrial area should be an alternative." (Doc. 18-4, p. 22). Another couple pleaded, "We strongly feel another location should be selected where there are no residents." Id. at 44. The form letters had similar complaints. (Doc. 18-3, pp. 28-72; Doc. 18-4, p. 15). Finally, the petition demanded, "An industrial location should be selected." (Doc. 18-3, pp. 73-90; Doc. 18-4, pp. 2-14; Doc. 18-14, p. 28).

Eleventh Circuit has yet to address the "effective prohibition" portion of the TCA. There is currently a split amongst circuits regarding what requirements a plaintiff must meet to show effective prohibition. See PI Telecom Infrastructure, 104 F. Supp. 3d at 1346; see also Andrew Erber, Note, The Effective Prohibition Preemption in Modern Wireless Tower Siting, 66 Fed. Comm. L.J. 357, 365 (2014). The Fourth Circuit has interpreted this provision to only prohibit "a 'blanket ban' on wireless service," "a general policy that essentially guarantees rejection of all wireless facility applications," or "the denial of an application for one particular site [that] is 'tantamount' to a general prohibition of service." T-Mobile Ne. LLC v. Fairfax Cnty. Bd. of Supervisors, 672 F.3d 259, 266 (4th Cir. 2012); see also AT&T Wireless PCS, Inc. v. City Council of City of Va. Beach, 155 F.3d 423, 428 (4th Cir. 1998). The Second and Third Circuits employ a two-step effective prohibition analysis: (1) determine whether the area has a significant gap in general wireless coverage, and (2) determine whether the applicant submitted sufficient evidence showing a lack of alternatives. See Sprint Spectrum L.P. v. Willoth, 176 F.3d 630, 643 (2d Cir. 1999); Cellular Tel. Co. v. Zoning Bd. of Adjustment of the Borough of Ho-Ho-Kus, 197 F.3d 64, 70 (3d Cir. 1999); Omnipoint Commc'ns Enters., L.P. v. Newton Twp., 219 F.3d 240, 244 (3d Cir. 2000). The First, Sixth, and Ninth Circuits apply a test similar to the Second and Third Circuits, with a slight variation. Instead of determining whether an area has a significant gap in general wireless coverage, those courts determine whether the area has a significant gap in the applicant's own wireless coverage. See Second Generation Props., L.P. v. Town of

Pelham, 313 F.3d 620, 634 (1st Cir. 2002); T-Mobile Cent., LLC v. Charter Twp. of

W. Bloomfield, 691 F.3d 794, 807 (6th Cir. 2012); MetroPCS, Inc. v. City & Cnty. of

S.F., 400 F.3d 715, 733 (9th Cir. 2005), abrogated on other grounds by T-Mobile S.,

LLC v. City of Roswell, Ga., 135 S. Ct. 808 (2015). The Fourth Circuit's approach is

the most stringent, while the test followed by the First, Sixth, and Ninth Circuits is

the most lenient. The Court need not determine which test the Eleventh Circuit is

most likely to adopt, as Plaintiff fails to meet even the most plaintiff-friendly

requirements.[8]

A district court conducts its effective prohibition analysis de novo. See Second

Generation Props., 313 F.3d at 629. As Defendant points out, Plaintiff must first

show the existence of a significant gap in coverage before the Court need consider

whether the proposed plan is the least intrusive means available. See MetroPCS,

400 F.3d at 734. The only evidence supporting Plaintiff's contention are maps

showing coverage before and after the construction of the proposed tower and

testimony at the hearing by Plaintiff's representative expressing the need to close in

the "gap." The coverage maps show a "best signal level" increase from greater than

or equal to -90 and -100 dBm to greater than or equal to -70 and -80 dBm with the

---

[8] There is a further split amongst circuits as to the second part of the test. The Second, Third, Sixth, and Ninth Circuits determine whether the applicant's plan for the tower is the "least intrusive means" available, while the First and Seventh Circuits analyze whether there are "no alternative sites." See Erber, supra, at 372. The former seems to provide the lowest bar to a plaintiff, although it is not entirely clear that there is a significant difference between the two standards. See, e.g., T-Mobile S. LLC v. City of Margate, No. 10-cv-60029, 2011 WL 1303898, at *4 (S.D. Fla. Apr. 4, 2011). The Court does not reach the application of either standard in this case.

new tower. (Doc. 18-17, pp. 18-19). The testimony of Plaintiff's representative at the hearing merely verbalizes that which is shown by the propagation maps. (Doc. 21-1, pp. 2-3). The scant evidence submitted to the Board and, subsequently, the Court does not amount to the showing of a significant gap in coverage. Plaintiff did not submit any evidence such as engineering data or customer testimony that has been used to support a "significant gap" argument in other cases. See, e.g., MetroPCS, 400 F.3d at 733; T-Mobile Cent., 691 F.3d at 807. Although it is possible that propagation maps alone may support a finding of a significant coverage gap, Plaintiff's color-coded maps display only a change in signal strength without explaining the effects of the current weaker signal on cellular customers. Plaintiff has not submitted any evidence to the Court that would allow a determination of the existence of a coverage gap. While Plaintiff has shown a gap in signal strength in the stadium site area, Plaintiff has not carried its burden of showing that this gap is significant in terms of coverage for purposes of the effective prohibition analysis. Therefore, Defendant's motion for summary judgment on this issue is due to be granted, and Plaintiff's motion for summary judgment must be denied.

## C. Remedy

The TCA does not provide a remedy for a violation of its substantial evidence provision. It only states, "Any person adversely affected by any final action . . . by a State or local government . . . that is inconsistent with this subparagraph may, within 30 days after such action . . . , commence an action in any court of competent jurisdiction. The court shall hear and decide such action on an expedited basis." 47

U.S.C. § 332(c)(7)(B)(v) (2012). The Eleventh Circuit has recognized that "developing case law hold[s that] injunctive relief best serves the TCA's explicit goal of expediting resolution of this type of action." <u>Preferred Sites</u>, 296 F.3d at 1222 n.13. The court held that "an injunction ordering issuance of a permit is an appropriate remedy for a violation of [the TCA]." <u>Id.</u> at 1222.

In this case, Plaintiff urges the Court to "enter an injunction or other order directing the City's Board of Zoning Adjustment to approve Cellular South's Application." (Doc. 22, p. 16). The Court finds, as other district courts in the Eleventh Circuit have found, that an injunction is proper here to facilitate the TCA's goal of "expediting [the] resolution of this type of action." <u>See, e.g.</u>, <u>Verizon Wireless of the E., L.P. v. Columbia Cnty., Ga.</u>, No. CV 114-211, 2015 WL 1877452, at \*16-17 (S.D. Ga. Apr. 23, 2015); <u>TowerCom V, LLC v. City of Coll. Park, Ga.</u>, No. 1:13-cv-530-SCJ, 2013 WL 4714203, at \*11 (N.D. Ga. Aug. 21, 2013); <u>T-Mobile S. LLC v. City of Margate</u>, No. 10-cv-60029, 2011 WL 1303898, at \*12 (S.D. Fla. Apr. 4, 2011). Having found that Defendant's denial of Plaintiff's request for zoning variances to construct a cell phone tower is not supported by substantial evidence contained in the written record, and thus a violation of 47 U.S.C. § 332(c)(7)(B)(iii), the Court **ORDERS** Defendant to approve Plaintiff's application for zoning variances.

## <u>CONCLUSION</u>

Plaintiff's motion for summary judgment is hereby **GRANTED as to Count**

**1 and DENIED as to Count 2**, and Defendant's motion for summary judgment is **GRANTED as to Count 2 and DENIED as to Count 1**. Defendant is hereby **ORDERED** to approve Plaintiff's application for construction of its cellular tower at the stadium site location.

 **DONE** and **ORDERED** this 8th day of July, 2016.

       /s/  Callie V. S. Granade
       SENIOR UNITED STATES DISTRICT JUDGE